# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Brian Jamel Redding, Appellant.

Appellate Case No. 2022-001213

---

Appeal From Jasper County
Robert J. Bonds, Circuit Court Judge

---

Opinion No. 6152
Submitted April 1, 2026 – Filed July 1, 2026

---

## REVERSED

---

Senior Appellate Defender Lara Mary Caudy, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Deputy Attorney General Melody Jane Brown,
and Senior Assistant Deputy Attorney General Deborah
R.J. Shupe, all of Columbia; and Solicitor Isaac
McDuffie Stone, III, of Bluffton, all for Respondent.

---

**PER CURIAM:** Brian Jamel Redding appeals his convictions for murder and
possession of a weapon during the commission of a violent crime, arguing the
circuit court erred in denying his motion for a directed verdict. We reverse.

**FACTS**

A jury convicted Redding of the September 6, 2020, murder of his girlfriend (Victim) and a weapon charge. At trial, the State presented evidence that Victim died from a gunshot wound to her forehead in the bed of a motel room at the Forest Motel. Sergeant Christopher Warren, of the Ridgeland Police Department, testified he received and responded to a call at approximately 9:45 a.m. regarding Victim. Redding, appearing upset, was found sitting on the bed inside the room. There were no signs of a struggle or gun, but a shell casing with only Victim's fingerprints was found in the room. Officers admitted they did not initially knock on other doors at the motel, talk to individuals in the parking lot, or stop any vehicles from leaving. Once they began investigating, officers learned Redding and Victim had been living at the motel for a month or two and no one there had witnessed domestic discord between them. In addition, on the day in question, no one in the area heard anything, saw Redding with a gun, or witnessed Redding and Victim arguing. Redding voluntarily gave investigators his phones and a written statement, submitted to gunshot residue and DNA tests, and allowed multiple searches of the Toyota Avalon he had been driving.

Various items were retrieved from the scene and tested, including Redding's clothing, blood from the interior and exterior of the motel room door, and the shell casing. The test results showed (1) only Victim's DNA under her fingernails; (2) only Victim's DNA on the shell casing; (3) Victim's DNA on the blood on the exterior door handle of the motel room; (4) a mixture containing Victim's and Redding's DNA on the blood on the interior of the motel room door; and (5) Victim's DNA and Redding's YSTR profile on the blood on the exterior of the door.[1]

South Carolina Law Enforcement (SLED) investigator Katie McCallister, in attempting to confirm Redding's alibi, observed a surveillance video of Redding at Parker's Kitchen, a gas station, and stated that in the surveillance video taken at 6:33 a.m. the morning of the incident, Redding was wearing long denim shorts and what she believed to be a "black shirt . . . [with] a Batman emblem on the front." However, upon her arrival at the motel, Redding was wearing long denim shorts and a red t-shirt. She did not see any blood on him. Victim's phone was searched and contained a video of Redding holding an "aqua, teal, turquoise" colored gun.

---

[1] The State's witness explained YSTR testing targeted male DNA in order to develop the male DNA profile and it followed the lineage of the paternal side.

The shell casing found at the scene was a .9mm caliber, and the State's expert testified that the bullet recovered from Victim's autopsy was "consistent" with a SCCY .9mm. The expert also testified the bullet could have been fired from a SCCY .9mm gun and that SCCY manufactured teal .9mm guns.

Paige Mayma, Victim's sister, testified she and her boyfriend, Devron Jones, both carried guns. On the day of the murder, Jones passed a bag containing one of Mayma's guns over the fence separating the Forest Motel from the Siesta Motel next door. Matthew Hatchell testified that at the time of the incident, he lived at the Siesta Motel. He described the motels as next door to each other, separated by a chain-link fence. Hatchell testified that on the morning of the incident, Jones handed him the bag over the fence, asked Hatchell to hold it, and Jones retrieved it approximately twenty minutes later. This occurred just after Hatchell returned to the Siesta after work, and there were numerous people outside of the Forest Motel, including Mayma. Hatchell did not look inside the bag.

Numerous of Victim's sisters and friends testified that Redding carried a .9mm blue/aqua/turquoise gun. Two of Victim's friends testified they saw Victim with a gun and Redding had a turquoise/blue and silver gun about one-and-a-half weeks before Victim's death. They also testified Redding and Victim had difficulties and Redding controlled Victim.

A trace evidence expert for SLED testified she analyzed Victim's and Redding's gunshot residue tests. She admitted residue was "extremely transferable" and confirmed Victim had residue on her body. She found no residue on Redding's hands. However, she found two particles of residue on the front right side of Redding's shorts, explained the test did not show when the residue contacted Redding's shorts, and admitted it could be transferred to a person's clothing by sitting on a bed that had residue.

The pathologist who performed an autopsy testified Victim's cause of death was a contact gunshot wound to the forehead and the manner of death was homicide. There were no other signs of trauma on Victim's body. The pathologist was unable to determine Victim's time of death and clarified her report provided Victim's time of death was 9:00 a.m., which was given by the coroner.

After the State rested, Redding moved for a directed verdict. The court denied Redding's motion, finding "enough" evidence existed to submit the case to the jury.

Redding presented his case-in-chief, providing evidence of his alibi defense. Christopher Watkins, qualified as an expert in digital forensic science, cellular tower data, and cellular communications data, constructed a timeline of cell site information on Redding's two phones. At 6:15 a.m., Redding's cell phones were moving from the vicinity of the motel toward East Main Street. By 6:29 a.m., the phones approached Parker's Kitchen on Okatie Highway. At 6:48 a.m., they were in the vicinity of Ashley Dodson's residence. By 7:15 a.m., the phones neared McDonald's in Bluffton. At 7:23 a.m., the phones were in the vicinity of Simmonsville Road in Bluffton. At 7:35 a.m., the phones left that vicinity. Between 8:06 and 8:27 a.m., the phones were back in the vicinity of the motel. At 8:27 a.m., the phones again departed from the motel and approached the residence of Danielle Smith, Redding's cousin. At 9:32 a.m., the phones departed the area of Danielle's address and by 9:45 a.m., they again returned to the motel.

Danielle testified she could not recall exactly the time Redding picked her up the morning of the incident, but believed it was between 7:45 and 8:00 a.m. They stopped by the motel for Redding to retrieve his wallet; Danielle stayed in the car; and they left within a few minutes. She noticed nothing out of the ordinary while she waited or when he returned to the car. She testified they then left the motel and drove to her grandmother's house in Pineland, which took about fifteen or twenty minutes. Redding appeared fine and was acting like "his normal self." Danielle saw neither blood on Redding nor a gun. Alvin Shiggs, Redding's uncle, testified that Redding came to his house the morning of the incident, which is also in Pineland, and Shiggs noticed nothing out of the ordinary.

Redding testified he was driving Ashley Dodson's vehicle on the day of the murder because his vehicle was in the shop. That morning, he had to take Dodson to work at 7:00 a.m. He stopped en route at Parker's Kitchen. The video from Parker's Kitchen depicted Redding in Dodson's vehicle at 6:31 a.m. It also depicted Redding getting underneath the vehicle, which he explained was because a dust cover was dragging on the road from beneath the vehicle, and he folded it to temporarily fix it. Redding testified he continued to Dodson's house, drove her to her job at McDonald's in Bluffton, drove to Simmonsville Road to pick up Danielle, and returned to the motel for his wallet. Redding testified that when he entered the motel room, Victim was in bed, they spoke, and he used the bathroom, got his wallet, and left. Redding maintained he then drove Danielle to Pineland to his uncle, Alvin Shiggs', house. Redding testified he changed his shirt because it got dirty when he again attempted to fix the dust cover underneath the car on his uncle's mostly-dirt driveway. Redding testified he next returned to the motel, saw Piavin Patel, the owner of the motel, and briefly spoke to him. According to

Redding, upon entering the motel room, he saw blood and touched Victim, attempting to awaken her. He then ran to tell Patel, called 911, and called Victim's family.

Shiggs testified Redding was living with him after the murder, and two months later, after Redding was arrested, Shiggs bagged Redding's belongings including the Batman shirt, and gave the bag to Redding's mother. He denied ever "doing anything" to the clothing. Redding's mother testified the bag stayed intact at her house until she was contacted by an investigator, who collected the Batman shirt from her the day before the trial. The shirt was not tested. The defense moved to introduce it into evidence, and the court denied the motion.

Redding also presented evidence disputing a contentious relationship with Victim and regarding the day in question. Patel testified he never received complaints about or witnessed any fights between Redding and Victim. Patel testified he saw Redding arrive at the motel on the day of the incident at approximately 8:00 a.m., at which time Redding spoke to him and "gave him good morning." Patel did not notice any distress, blood, or anything wrong at the time. A "couple hours" later, Patel was working in a utility room a few doors down from Redding's room and heard Redding crying. When Patel went to Redding's room, he did not notice any blood on Redding. Patel's wife called 911 and was told someone had already called.

Redding testified he cooperated with the investigation, gave investigators his phone, interviewed, submitted to gunshot residue and DNA tests, and allowed multiple searches of Dodson's vehicle. He also testified he had never owned a blue gun and he sold his gun to his cousin about a month prior to the murder.

After the defense rested, Redding renewed his motion for a directed verdict. First, he asserted the court should grant his motion as to the murder charge because the State failed to present evidence showing he killed Victim or he did so with malice, which had to exist at the time of the crime. Redding also asserted the State failed to prove Victim's time of death, and if the State relied on the pathologist's report that Victim's time of death was 9:00 a.m., he had an alibi, which was corroborated by the phone records. In response, the State argued the pathologist explained how difficult it was to prove time of death. In addition, the State argued it was not required to prove the time of death. It maintained that even though its evidence was circumstantial, there was "ample evidence to go to the jury."

The court denied Redding's renewed motion, the jury convicted him as indicted, and the court sentenced him to concurrent sentences of forty-eight years' imprisonment for murder and five years' imprisonment for the weapon charge. This appeal followed.

## STANDARD OF REVIEW

An appellate court "review[s] the denial of a directed verdict motion in a criminal case under the any evidence standard of review." *State v. Cain*, 419 S.C. 24, 33, 795 S.E.2d 846, 851 (2017). "When reviewing a denial of a directed verdict, this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the state. If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury." *State v. Weston*, 367 S.C. 279, 292–93, 625 S.E.2d 641, 648 (2006). "[W]hen the defendant presents testimony, he loses the right to have the court review the sufficiency of the evidence based on the state's evidence alone." *State v. Harry*, 321 S.C. 273, 277, 468 S.E.2d 76, 79 (Ct. App. 1996); *see State v. Hepburn*, 406 S.C. 416, 432, 753 S.E.2d 402, 410 (2013) (declining to overrule *Harry* "and instead adopt[ing] its rationale").

## LAW/ANALYSIS

Redding argues the circuit court erred in denying his motion for a directed verdict because the State did not present direct or substantial circumstantial evidence of his guilt and the evidence raised merely a suspicion of guilt. We agree.

"In considering a motion for a directed verdict, the trial court is concerned with the existence or non-existence of evidence, not with its weight." *State v. Fennell*, 340 S.C. 266, 270, 531 S.E.2d 512, 514 (2000). "When the evidence submitted raises a mere suspicion that the accused is guilty, a directed verdict should be granted because suspicion implies a belief of guilt based on facts or circumstances which do not amount to proof." *State v. Bennett*, 415 S.C. 232, 236, 781 S.E.2d 352, 353–54 (2016). However, "a court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* at 236, 781 S.E.2d at 354. Therefore, "although the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt." *Id.* at 237, 781 S.E.2d at 354. "[I]n ruling on a directed verdict motion where the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt."

*Id.* "Circumstantial evidence . . . gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury." *State v. Tillman*, 433 S.C. 58, 63, 856 S.E.2d 168, 171 (Ct. App. 2021) (omissions in original) (quoting *State v. Rogers*, 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct. App. 2013)).

We review the substantial circumstantial evidence presented in various cases for comparison. In *State v. Arnold*, 361 S.C. 386, 388, 605 S.E.2d 529, 530 (2004), Jennings Cox, the victim, was found shot to death in Colleton County. Three days earlier, when he was reported missing, Cox borrowed a friend's BMW and withdrew money from an ATM. *Id.* The BMW was found in a parking lot in Johnson City, Tennessee. *Id.* at 389, 605 S.E.2d at 530. The State presented evidence that the day after Cox went missing, Arnold made a phone call from his father's home phone in Tennessee, ten miles from where the car was found. *Id.* No blood was found in the car; however, the car had some scratches on it and a coffee cup lid containing Arnold's fingerprint was found in it. *Id.* Our supreme court held that Arnold's fingerprint on the coffee cup lid and being found in Tennessee, the same state the BMW was found, raised only a suspicion of guilt. *Id.* at 390, 605 S.E.2d at 531.

In *State v. Mitchell*, 341 S.C. 406, 408, 535 S.E.2d 126, 127 (2000), the victim's home was burglarized. Mitchell had been a guest at the victim's home on several occasions. *Id.* Mitchell's fingerprint was found on a screen leaning against the house. *Id.* At trial, the circuit court denied Mitchell's motion for a directed verdict. *Id.* In finding Mitchell was entitled to a directed verdict, our supreme court found the following:

> The evidence in this case is entirely circumstantial. The only evidence linking [Mitchell] to the burglary is the fingerprint. The State did not present any evidence whether the screen was on the window at the time the window was broken or when the screen had been removed. The fact that [Mitchell's] fingerprint was on a screen that was propped up against the house does not prove entry where [he] had been in and around the victim's house a[t] least three times prior to the burglary.

*Id.* at 409, 535 S.E.2d at 127.

In *State v. Bostick*, 392 S.C. 134, 136, 708 S.E.2d 774, 775 (2011), the fire department arrived at the victim's house on a Sunday afternoon after her house caught fire. Firefighters discovered the victim's body in the house. *Id.* Although the victim had been struck in the head with a blunt force object, she ultimately died as a result of carbon monoxide poisoning from the fire. *Id.* Two days later, investigators discovered the following items in a burn pile at a neighboring house belonging to Bostick's mother: "two sets of car keys, toenail clippers, pens, burned paper, a metal clasped ring of a purse, and a watch." *Id.* at 137, 708 S.E.2d at 775. All of these items belonged to the victim. *Id.* Investigators later determined that the person responsible for the fire at the victim's house used a heavy petroleum product, such as kerosene or diesel fuel. *Id.* Bostick's mother stated that she did not use either of these products in the burn pile. *Id.* Investigators interviewed Bostick and asked for his clothing and shoes. *Id.* Blood was found on Bostick's jeans, but a DNA analysis proved inconclusive. *Id.* at 137, 708 S.E.2d at 775–76. However, a chemical analysis of Bostick's shoes revealed a fresh gasoline pattern. *Id.* at 137, 708 S.E.2d at 776. Bostick moved for a directed verdict at the close of the State's case, which the trial court denied. *Id.* Bostick argued on appeal that the evidence submitted did not constitute substantial circumstantial evidence sufficient to submit the case to the jury. *Id.* at 138–39, 708 S.E.2d at 776. Our supreme court agreed and found that the State's evidence raised only a suspicion of Bostick's guilt. *Id.* at 141, 708 S.E.2d at 778.

In *State v. Lollis*, 343 S.C. 580, 581, 541 S.E.2d 254, 255 (2001), our supreme court also found the circumstantial evidence presented by the State was not sufficient to survive a motion for a directed verdict in a case involving an arson charge. Lollis and his common law wife, Tammy Burgess, lived in a mobile home. *Id.* at 582, 541 S.E.2d at 255. Burgess confessed to setting fire to the home to erase the couple's mortgage debt. *Id.* Burgess claimed that Lollis had no knowledge of her plans. *Id.* Both Lollis and Burgess were charged with arson. *Id.* The circumstantial evidence relied upon by the State was Burgess and Lollis's marital relationship, the alleged financial difficulties, the fact that Lollis moved personal items out of the home and into storage the day before the fire, and his possession of the storage room key on the day of the fire. *Id.* at 584, 541 S.E.2d at 256. Lollis presented uncontradicted evidence that he was current on his mortgage at the time of the fire. *Id.* at 585, 541 S.E.2d at 257. He also testified he had no reason to burn down his home because of extensive remodeling being done at the time of the fire, he had moved his belongings into storage in order to protect them from damage due to that remodeling work, and he had no insurance on personal property lost in the fire. *Id.* at 582–83, 541 S.E.2d at 255. The court held the

State's evidence was not sufficient to survive the motion for a directed verdict. *Id.* at 585, 541 S.E.2d at 257.

In this case, viewing the evidence in the light most favorable to the State, we do not find substantial circumstantial evidence; thus, we hold the circuit court erred in submitting the case to the jury. *See Weston*, 367 S.C. at 292–93, 625 S.E.2d at 648 ("If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury."). The State did not present direct evidence that Redding murdered Victim and presented the following circumstantial evidence: Redding (1) exhibited controlling behavior and had a difficult relationship with Victim, (2) had access to a gun matching the caliber gun that killed Victim, (3) was the last person to see Victim alive, (4) changed his shirt the morning of the murder, and (5) had gunshot residue on his shorts. The State also presented evidence showing Redding's DNA was present in the blood stains on the motel room door although Redding testified he touched Victim before leaving the room to find Patel.

Here, Redding presented significant evidence of an alibi defense and plausible evidence regarding his shirt, his DNA on the door, and the gunshot residue. *See Lollis*, 343 S.C. at 585, 541 S.E.2d at 257 (finding "the evidence presented does not reasonably tend to prove Lollis' guilt" in part because Lollis "presented a plausible explanation for placing valuables in the storage room on the day of the fire"). We find the State's evidence rises only to a mere suspicion of guilt. Thus, we reverse the circuit court's denial of Redding's motion for a directed verdict.

**CONCLUSION**

Based on the foregoing, Redding's convictions are

**REVERSED.**[2]

**THOMAS, MCDONALD and TURNER, JJ., concur.**

---

[2] We decide this case without oral argument pursuant to Rule 215, SCACR.